Good morning, Your Honor. David Wilson on behalf of the County Appellants and the individual named defendants who are part of the County Sheriff's Department. I would like to try to reserve, I'll keep an eye on the clock, and try to reserve two minutes for a rebuttal period with the Court's permission. Qualified immunity is designed to protect law enforcement officers who make mistakes. But here, the trial court didn't do any qualified immunity analysis in a case where that's the crux of where the decision should come out. There's no dispute that the domestic violence call... So we dismiss the appeal? Well, no, Your Honor. We're asking the court to do the qualified immunity analysis here that the district court did not do based on the record. But without a qualified immunity ruling, you don't really have an appealable case. You're stuck back in the district court. Maybe you can try to get a mundane or something to try to force the district court to rule on your qualified immunity claim. But if there's no ruling, you haven't got anything to appeal. We move for summary judgment based on qualified immunity. And the ruling of the district court is in effect a denial of the application of qualified immunity. But the error in the order denying, partially granting and partially denying the motion for summary judgment, the error in that order is that the district court didn't do the qualified immunity analysis that the record calls for here. Well, being generous, we could say, look, the district court looked at this and says, look, there are lots of disputed issues of fact. And this is sort of the ellipsis that I will fill in just to be generous to you, to the idea that we have an appealable judgment, and I have done the qualified immunity analysis, assuming all the facts as plaintiff have presented them, because after all, you have to take the facts as presented by a non-moving party. And applying those facts as plaintiff has presented them, there's no basis for qualified immunity. Now, if that's what the district court said implicitly, then we've got an appealable order. But then you've got a problem. How do you get around their facts? I mean, you assume their facts. There's no qualified immunity. Well, we think there is qualified immunity even taking their factual description of what happened, Your Honor. Okay. Given the fact that they were the deputies who arrived on the scene were investigating a domestic violence call. They proceeded reasonably based on what they saw when they came to this, what turned out to be an incorrect address. They get there. The address where the call originated is not there. So we know they go to a place that's different from the one that they got the call from, or they thought they got the call from. Right? Yes. And taking their facts, what they go around, they see this guy sitting in his garage, a garage that, according to him, was clearly not a, you know, had wood beams, you know, sort of bare walls and wood beams, and obviously just a garage that's used for keeping a car. They draw their guns and proceed to sort of give him a hard time over it. And then when they don't get anywhere with him, they go to the house, which is still the wrong address. It can't conceivably be the right address. Whether you transpose the numbers or anything else, it's the wrong address, and they force their way in. And they insist that the daughter who is in the shower come out without even a bathrobe and go rummaging through the house. That's a fact. Have I sort of overstated their facts? You have described accurately what they have described happened from their perspective. Well, the qualified immunity has to be measured not only from the description of the facts that the plaintiffs present, but also what the deputies reasonably saw based on those, based on the facts that the plaintiffs described. When they arrived in response to the plaintiffs, they saw that the plaintiffs did not have a qualified immunity. They found only one house that was close to that 1729 address where there was any activity. And so they investigated there, investigated in the house to find out whether anybody was suffering domestic violence. Let's start with him. Guns drawn? I don't understand. You go walk up to a point, a gun at somebody at the wrong address for doing nothing suspicious at all because you've got some call? I don't understand. I don't think this would have happened if this had been Pasadena or Beverly Hills. I just don't think something like that would have happened. They would have said, oh, I think we probably have a mistake. I think we're calling. How long does it take to call dispatch and say call the complainant back and get a second read on the address? It doesn't take five minutes. There were no screams coming from the house. Nobody was, you know, there was no evidence that somebody's life was in danger. I don't understand. You know, they knew that mistakes are made, right? They knew letters could be, numbers could be transposed. They said they've had the same experience recently. I don't quite get it. I think if it happened in your neighborhood or mine, I think we'd be really upset about this. Well, and yes, Your Honor, it's certainly true that the residents of that. But it wouldn't happen in our neighborhoods is the point. Well, I don't. I mean, I don't know where you live, but I don't think we have it in my neighborhood. It's certainly true that the plaintiffs here are extremely sensitive to the deputies arriving, particularly given their past experience, and that was reasonable for them. It's reasonable for them to have that sensitivity. But it's also reasonable for the deputies arriving on the scene who were not involved in any prior events at that address to view with suspicion the reactions that they got. The young man, for example, answering the back door rather than admitting the police closed the door and walked away. Perfectly reasonable and innocent explanation for that. That's not his story. His story is that first I think maybe I'm misreading the record. Maybe I'm misremembering. But I thought what he says, he's sitting in the garage and the police walk up with their guns drawn. I'm talking about the son, Your Honor, rather than about Mr. Steele. Oh, I'm sorry. In the garage. And there is a dispute. There is a factual dispute about that. What do you make of the fact that they get up there and the lady of the house says, look, there's no problem. They've got the guy that they think is the bad guy with a gun. They've got him localized downstairs. Right. And they go up to what they know is the wrong address. It's not the address they were given. It's not even the transposed address. It's not 13 as opposed to 31. They go up there and the lady says, there's no problem. Go away. Why not, you know, what gives them authority to bust a door in and say we insist on coming in? Well, I think they're entitled to investigate, to continue their investigation of the domestic violence call until they're satisfied that it's actually true. At the wrong address? Why don't they go to the house next door or the house across the street or a block away? Because this is the only house where there was activity at the point in time when they pulled up. But if a mistake was made, it could be a mistake. They called 31 or was it 29? I believe it was 1731 was the call and then 1729 was the correct address. Did they check out 1713, which would have been the sort of transposed numbers? Well, when the deputies left this address, what they did was call to get a better address and also to go check 105th Street to see if that was the address. Given that they know there's a problem with the address and the address that they actually go to has very little in common with the one that they were given, except that it's sort of the nearest number. Of course, there are two nearest numbers. There's one on either side, right? They pick this one. There's nothing in the house until they knock on the door. There's no activity. It's not like there's screaming coming out. It's not like they see people strangling each other in the windows. There's no shattered glass. There's no evidence of an altercation. They knock on the door. The lady says, I didn't call. There was no call here. Why is it reasonable for police officers at that point to say, well, we don't care. We're going to come in and we're going to make your daughter come out of the bathroom in her skivvies? I think it's reasonable for them to investigate because of the volatile nature of domestic violence calls and the nature of the call that it changed. She's standing right there. The woman calls. She says, I'm being choked. Now, they've got a woman at the door. They can see she's not being choked. Why don't you say, hold on a sec, man. We'll call dispatch and double-check that address. Why isn't that the reasonable thing for officers to do rather than bursting in and rummaging around the house? That is one reasonable thing for the officers to do, but in the qualified immunity context, the test is not whether the deputies did the least intrusive thing, but if what they did was reasonable. I thought the test was whether this is a matter that should go to the jury, whether we believe that this is a question that a jury might find was not reasonable. If there's a dispute of fact, yes, Your Honor. But even taking the description of the facts from the plaintiff's perspective and based on what the deputies knew as they went through each step along the way, because until they investigated, they were not aware that no one inside had been beaten. They were not aware that no one inside was bruised until they investigated. And it is reasonable for these plaintiffs to be upset about what happened here. That doesn't change whether what the deputies did in this investigation was reasonable. And I see that my time has expired. If there are no other questions. Well, if necessary, let me give you a mask or a bottle. Thank you. Thank you. Let me ask you a question. You mentioned something about a jury. Now, if the plaintiff's facts are assumed to be true and the defendant's facts contradict that, and that's what you say happened here, there clearly was a constitutional violation. But on qualified immunity, if the facts of the plaintiff and the facts of the defendant vary, then it should go to a jury, right? If the facts are — if there's a genuine dispute of fact, yes, Your Honor, it should go to the jury. Our view is that if you take the facts as described by the plaintiffs and look at them through the eyes of the deputies as they're learning what is happening, as it all expands for them, as they continue their investigation, that their actions were reasonable there and, therefore, they're entitled to qualified immunity. Well, assuming that there's a dispute of fact here, there was no jury trial. That's right, Your Honor. There was no jury trial. This is a denial of the summary judgment. If part simply granted summary judgment, right? Partially granted summary judgment and denied on the qualified immunity, yes, Your Honor. Well, what portion did he grant for qualified immunity? He did not grant on qualified immunity. He granted on holding that there was no arrest. So he granted summary judgment on the false arrest claim. And then he collapsed the Monell claim into the separate claim that the plaintiffs made for Fayer to train. That was against Los Angeles County, right? Yes, Your Honor. And so he basically found for all plaintiffs, right? Yes, Your Honor. And so you're attempting to reverse the entire matter. Yes. I thought, well, I guess I'm wrong. The panel is faced with a qualified immunity to the county. And so if there was not sufficient evidence to sustain the train, then that should be reversed on that ground. Is that right? Yes. And so you're arguing that and you're also arguing that there should be a qualified immunity granted to the sheriff and the chief and the other subordinate officers. Am I correct on that? Yes, Your Honor, on the basis that for the higher level officers, the lieutenant, the captain, the commander, and the sheriff, they were not present. So there's no evidence of any constitutional violation on their part as an individual defendant. And so under Saussure, they're entitled to qualified immunity. Well, but Ledesma, Young, Terry, and Olan were present. Is that correct? Yes, Your Honor. Those four deputies are the four deputies who were present. They're the ones that the district court denied summary judgment to them. And am I correct on that? Yes, Your Honor. Now, how about the sheriff and the chief and the other subordinates, Covertee and Jones? Those, the officer level above the deputy level, their summary judgment was denied as well. Their was what? Their summary judgment was also denied. Denied. And so you're seeking to reverse the entire matter. Yes, Your Honor. Okay. I think I understand your argument. District court held there was no arrest, yes? Yes, Your Honor. Do we review that? We didn't raise it. I don't think that the plaintiffs have asked for an affirmative relief in that regard. So we are only addressing the areas of summary judgment where we were denied, where defendant's motion was denied. The district court said there was no arrest. And so in deciding the qualified immunity question, what do we do about this incident? Are we bound by the district court's ruling where it said there's no arrest? Or do we have to look at the underlying facts and say, gee, this looks like an arrest to us, because they actually pointed the gun to the guy. And our cases are pretty clear, I thought, that pointing a gun turns what is otherwise a detention very quickly into an arrest. The district court's ruling on the arrest did not address Mr. Steele's claim of arrest, but Ms. Stubblefield and the children's claim of arrest. Okay. So in your view, whatever happens with the case, the district court's no-arrest ruling stands until final judgment? Yes, Your Honor. Okay. If there are no other questions, thank you. We'll hear from the closing counsel. Good morning, Your Honors. Counsel, there's clearly a constitutional violation here, at least in my judgment. So it really comes down to the qualified immunity, doesn't it? And can you address that? Yes, Your Honor. I don't want to formulate your argument, but am I correct on that, that the constitutional violation is clearly your position, at least? I realize that your adversary is arguing to the contrary, or at least that there was a dispute, but it still comes down, on their part, to qualified immunity. And so it seems to me that's the issue here, was there qualified immunity. Thank you for focusing, Your Honor. We believe there is no qualified immunity. There's nothing reasonable about what the officers did. I might note that police officers are supposed to know the area they patrol. Any taxi cab driver, any police officer, should know that there's an east side of town and a west side of town, 106th Street. And this can't be the first time a call came in through a cell phone, and it got sent to the west part of town, and finding a wrong address, the first thing anybody does is push a button on the handheld radio and inquire further, not to start searching the entire city, and go from house to house, street to street, but to follow the Constitution. And there was nothing, and I might add, the counsel said this was the only house that had activity. There was no activity in this house, other than a citizen of the United States, who was in his garage, enjoying the peace and sanctity of his home. So, yes, it is a matter of qualified immunity that's been focused by Your Honor, and there's no basis for qualified immunity, or it would vitiate the Fourth Amendment. And I'm pleased to note, and I thank counsel for sending a letter to this court, United States v. Martinez is a case that was published last month, and deals with the fact that the emergency doctrine doesn't apply, because the third leg of it, and also for exigent circumstances, you have to have some probable cause, and that's reasonable probable cause facts. And there are no facts that this house, or these people, living peacefully, were in the commission of a crime whatsoever. I'd like to add one other thing, just for clarity, because our brief wasn't fully clear, but it is indicated in the record. The call that came out was that a man had just choked a woman. It was in the past tense, and so even stronger argument is, something had happened somewhere, but it was not happening. And the reference by the deputies... That's pretty harsh, I bet. I mean, I got the past tense without doubt, but we know that people engaged in domestic altercations, these things sort of wane and wax, so they have encounters, and they're physical, and then there's a respite, and they go back to doing it, and the anger flares up again. You know, I think, frankly, I think you're being a little ungenerous to the police here. They were in a tough situation, and sure, we're sitting here in the court room, and you could say they should have called dispatch, but they are in a situation where they get a call, they get directed to that block and that house, and they get there, and they're confronted with a situation where none of the numbers match, and so they think, well, there could be somebody actually dying in the house. The woman called a few minutes earlier, said she had been choked. She thought that the man might be back to choking her, and while they're diddling with the address, she could be dying inside. I don't think, I think there could be some, have some degree of sympathy for a difficult situation, and that they may have made choices that, with the benefit of hindsight and with calm as we have now, we would think should have been made differently, but I think we have to give them some leeway. I think, for example, knocking on the door and sort of asking, I don't think that was unreasonable. No problem with that. Although maybe it would have been smarter for them to just not even do that, to call dispatch and ask for a bad address, but it was certainly entitled to check out the garage and talk to the man who was there. I understand. No, no, no. We can't disagree with that, can we? It's really the manner in which they carried it out that winds up being problematic. Yes, Your Honor. You're correct. And the entry. And, yes, that's a good observation. I agree. But they have to do it constitutionally and reasonably, and I think that's where the... It's a fine line. We always sort of talk about it as if it were like the big double yellow line down the middle of Orange Grove Boulevard. It's not. It's a shifting line. It's a line that people might not see the same way, and I think these were bad guys. They may have made a big mistake. That's all that you can say about it. The question becomes whether the big mistake they made amounts to a constitutional violation. And, Your Honor, as to the false arrest issue, I believe that it would be appropriate that this Court deal with that also so that we can not come back someday. Well, appropriate or not, it's before us. You didn't cross-appeal that, and I'm not sure you could have, because this is a qualified immunity appeal. Does this become part, does the question of whether there was an arrest become part of the qualified immunity analysis? Well, I would hope the Court could deal with it and give guidance and some relief so that we can try the case and not have the prospect of coming back for... So you want to sneak in an interlocutory issue is what you want to do. Thank you for saying it so much better than I could embrace it. Saying it that way doesn't help you at all. What I thought you were going to argue is that what we look at is the underlying conduct, and it doesn't matter whether it gets characterized in the arrest or not. The question is whether the underlying conduct was constitutionally permissible. And if the conduct is not constitutionally permissible and is beyond the scope of what an officer would do under the circumstances, it doesn't matter whether you call it an arrest or you call it something else. That's what I thought you would argue, and that's how you sneak it in. I think you said it better. Should we give Judge Lea a chance to say it better? I'll go with yes, too. See better ways of saying it. I take it you're willing to go with any of those ways, right? Yes, my objective is the same. Okay. I guess I'm just as well advised. Fair enough. Thank you very much. Do you read the district court order as ruling on a qualified immunity motion? I think it was intended to be a denial of... We certainly denied summary judgment on that, and that was, I guess, the primary, if not only, basis on which it was urged. I mean, I think there are three possibilities. One, the district court didn't rule on it and we don't have jurisdiction. But then that means that the district court has a second opportunity to rule on it. The second one is that the district court ruled on it in a cursory fashion and we have to just say they're genuine issues of material fact. That decision, it seems to me, is not appealable. But then we have to do a SASE analysis to see whether or not the facts as alleged fit qualified immunity on appeal. I mean, those are two possibilities. And the third one is that the district court did all the analysis and denied it for other reasons, which doesn't seem to be plausible to me. Which do you think happened? I can't read the judge's mind, but I presume he's well aware of SASE and made the proper analysis and denied qualified immunity. Can you speak up just a little bit? I cannot read the mind of the district court, but I believe he's certainly knowledgeable of the law and he was aware of SASE when he made his ruling and must have examined the evidence, even if he didn't articulate it. That's my... Well, qualified immunity has a two-part test to it, doesn't it? Yes, Your Honor. And so the first part relates to the plaintiff's statement, and you assume that to be true. And then here comes the defendant who sets forth their set of facts. And then the second part of this whole thing is whether there's a constitutional violation. And there... Well, I don't want to say that there clearly was, but it seems to me there was. And so I don't understand how the court ruled in the manner it did without saying that you're entitled to a jury trial. It ruled, of course, in your favor. So any judgment that you get, you're happy with. But why isn't this a jury trial? Why is it a jury trial, Your Honor? Why isn't it a jury trial? Isn't it? It is not a jury trial. It is a jury trial. It is set for jury trial. So if you win here, you want to go back and try it before a jury.  Otherwise, I have to work for it, Your Honor. I have to present it to a jury and get a judgment. And I believe... I have a better idea. I mean, let me commend to counsel the fine restaurants of Pasadena. The fine restaurants of Pasadena. Yes, Your Honor. We're very close to lunchtime. Maybe counsel can go out, have a nice lunch, and talk about ways of resolving this case. I mean, you've heard what we've said here. I don't think... I mean, I haven't talked to my colleagues, and I haven't conferred, but I don't think this is going to be an easy affirm. So in which case, you're all looking at a really miserable process ahead of you. Really miserable. And I think you all can keep in mind that there are legitimate claims and legitimate points of view on both sides. I don't think the police here were bad guys. I think they either were... But, you know, they were trying to do the right thing, and I think your clients certainly have good cause to be upset. Wouldn't this be nice if counsel went out and found an amicable resolution to the case? I would like nothing better, Your Honor. In fact, I think... Let me commend the parkway gorilla. I'll invite him to lunch, and I'll buy... I have to wait until at least the next oral argument is over, since I'm also apparently... Well, stick around. Well, we also have... I mean, in all seriousness, though, I think we do have a... I think counsel have done a very good job in this case of laying out the arguments and laying out the issues. And I think part of what lawyers do, good lawyers do, is not just litigate cases, but also try to find peace, try to find a resolve, understanding that there are legitimate concerns and legitimate points of view on the other side. So I think we're done. Did you want a minute for rebuttal? I think we understand the issues in this case. So we'll, in this case, submit it. If counsel find... You can stop the clock now. If counsel find in the next day or so that you are in serious discussions and would like time, send us a letter telling that, and we'll defer submission. It'd be the best thing in the world would be if there were no trial in this case. I look forward to sending that letter soon, if counsel wishes. I think starting by springing for lunch is a good way to get things off to the right start. Thank you, gentlemen. I take it that you opened the conversation by saying how much you want. Well, I think... I want him to say that. We'll make a reasonable demand. We'll leave that. Wait for the wine to get served. But anyway... You're not going to sell it otherwise. We'll sell it for a fair amount. Okay. Let's do our best, Your Honor. Okay. Thank you, Your Honor. Well, all this case submitted. But again, if you send us a letter in the next couple of days, we won't issue anything. I hope we can. I hope you can, too. Counsel has been very helpful, obviously, in briefing the issues. No one understands the case better than the three of you right now. So no one is in a better position to resolve it. Okay? You stick around for the next argument. We'll order this case submitted, and we'll now hear argument in court.
judges: Lay , Kozinski, Thomas